# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**AMERICAN PAN COMPANY,**

                       **Plaintiff,**

**-vs-**

**LOCKWOOD MANUFACTURING, INC.,**

                       **Defendant.**

                                                    **Case No. C-3-06-197**

                                                    **Judge Thomas M. Rose**

---

**ENTRY AND ORDER GRANTING LOCKWOOD'S MOTION FOR SUMMARY JUDGMENT (Doc. #46) AND GRANTING AMERICAN PAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. # 51)**

---

This matter is a dispute between Plaintiff American Pan Company ("American Pan") and Defendant Lockwood Manufacturing, Inc. ("Lockwood"). American Pan is an Ohio corporation headquartered in Urbana, Ohio. Lockwood is a Canadian corporation with its principal place of business in Brantford, Ontario.

Premier Pan Company, Inc. ("Premier Pan") was named as an additional Counterclaim-Defendant in Lockwood's Answer to American Pan's Amended Complaint. Premier Pan is a Pennsylvania Corporation. Premier Pan and American Pan are related entities and have common business interests.

American Pan makes one claim in its Amended Complaint. It alleges that Lockwood breached a Sales Agency Agreement between the parties. American Pan's original Complaint was brought in the Court of Common Pleas of Champaign County, Ohio and was removed to this Court by Lockwood based upon this Court having diversity jurisdiction.

Lockwood alleges five counts in its Amended Counterclaims. Count One is against American Pan for breach of the Sales Agency Agreement. Count Two is against American Pan and Premier Pan for conspiracy to fix prices in violation of the Sherman Antitrust Act, 15 U.S.C. § 1 et. seq. and in violation of Ohio's Valentine Act, Ohio Rev. Code § 1331.01 et seq. Count Three of Lockwood's Amended Counterclaims is a common law conspiracy-to-injure claim against American Pan and Premier Pan. Count Four is against American Pan and Premier Pan for violation of the Canadian Competition Act, R.S. 1985, c. C-34, s. 1 et seq. Count Five of Lockwood's Amended Counterclaims is against American Pan for breach of the duty of good faith.

On September 28, 2007, the Parties stipulated to the dismissal of all claims against Premier Pan without prejudice. (Doc. #42.) The Claim and Counterclaims between American Pan and Lockwood remain to be adjudicated.

Now before the Court are Lockwood's Motion for Summary Judgment (doc. #46) and American Pan's Motion for Partial Summary Judgment On Counts Two, Three, Four and Five of Lockwood's Amended Counterclaims (doc. #51). Both of these Motions are now fully briefed and ripe for decision. A summary of the relevant facts will first be set forth followed by the standard of review for motions for summary judgment and an analysis of the Motions.

## RELEVANT FACTS

### The Parties

American Pan manufactures and sells commercial baking pans including "custom pans" and "stock pans" to commercial baking companies throughout the world.[1] (Answer to Amended Counterclaims ¶ 10;  Deposition of Gilbert L. Bundy ("Bundy Dep.") 9-10, 20 July 18, 2007.) Commercial baking pans are baking pans used by people who resell baked goods. (Id. 38.) "Custom pans" are commercial baking pans manufactured to a customer's specifications. ((Deposition of Patrick Murray ("Murray Dep.") 38 July 17, 2007.) The pricing for "custom pans" is negotiated between the manufacturer and the customer. (Id.) Since the year 2000, American Pan has had most of the market for the sale of "custom pans" in the United States. (Answer To Amended Counterclaims ¶ 11.)  "Stock pans" are common-size pans that are kept in inventory for sale. (Murray Dep. 28.)

Lockwood is a manufacturer and seller of commercial baking pans and a seller of commercial baking pans manufactured by others. (Amended Compl. ¶ 4; Murray Dep. 35-36.) Lockwood sells commercial baking pans in Canada and the United States. (Answer to Amended Compl. ¶ 1; Murray Dep. 131-39.) Lockwood also reglazes commercial baking pans and applies nonstick coatings. (Murray Dep. 43-44.) Premier Pan manufactures commercial bread pans and bread and layer cake strap pans. (Bundy Dep. 10.)

---

[1]Currently American Pan manufactures and sells custom bun and roll pans, specialty cake pans and applies nonstick coatings to pans. (Bundy Dep. 9.) Chicago Metallic currently manufactures the stock pans that were previously manufactured by American Pan. (Id. 9-10.)

**The Asset Purchase Agreement**

On August 6, 1993, American Pan and Lockwood entered into an Asset Purchase Agreement. (Lockwood Mot. Summ. J. Ex A.) The Asset Purchase Agreement provides for the sale of certain of Lockwood's manufacturing assets to American Pan. (Id.) The Asset Purchase Agreement also contemplates that the Parties, simultaneously with the closing of the Asset Purchase Agreement, would enter into a separate agency agreement regarding the sale of certain products to be produced by American Pan and Premier Pan. (Id.) American Pan acquired Lockwood's assets because Lockwood no longer wanted to produce pans and was looking for someone to produce pans for the Canadian market. (Bundy Dep. 25-26.)

**The Sales Agency Agreement**

Pursuant to the terms of the Asset Purchase Agreement, American Pan, Premier Pan and Lockwood entered into the Sales Agency Agreement. (Lockwood Mot. Summ. J. Ex. B. (the "Sales Agency Agreement")) The Sales Agency Agreement was entered into simultaneously with the closing of the Asset Purchase Agreement. (Affidavit of Elizabeth A. Bundy ("E. Bundy Aff.") ¶ 4 Aug. 17, 2006.)

When the Sales Agency Agreement was executed, Paul Murray was the President of Lockwood. Russell T. Bundy was the President of American Pan and Russell T. Bundy and John Bundy were the Co-Presidents of Premier Pan when the Sales Agency Agreement was executed.

Sometime in 2002 or 2003, Patrick Murray ("Murray") became the President of Lockwood. (Murray Dep. 32 .) Murray is Paul Murray's son and owns the majority of Lockwood. (Id. at 31, 33.)

In 1997, Gilbert L. Bundy ("Bundy") became president of American Pan. (Bundy Dep. 8.) Bundy is Russell T. Bundy's son. (Id. 11.)

The Sales Agency Agreement provides that American Pan will not compete against Lockwood in Canada for the sale of American Pan's products, that Lockwood will not compete against American Pan in the United States for the sale of American Pan's products and that, provided certain conditions are satisfied, Lockwood will purchase all of its commercial baking pans from American Pan. (Sales Agency Agreement.) Lockwood will purchase all of its commercial baking pans from American Pan if American Pan provides the commercial baking pans to Lockwood at competitive prices, if the pans are of competitive quality and if the pans are delivered on a timely basis. (Id.) If American Pan and Premier Pan are unable to meet the price, quality and/or delivery requirements, Lockwood may seek other sources for the respective products after Lockwood, prior to placing the order, informs American Pan and Premier Pan. (Id.) If American Pan and Premier Pan elect not to continue manufacturing an existing product or elect not to manufacture a new product, Lockwood may purchase the product from other sources. (Id.)

In addition, the Sales Agency Agreement provides that it may be terminated by American Pan, Premier Pan or Lockwood with ninety (90) days written notice. Finally, all notices under the Sales Agency Agreement are to be given as under Paragraph 15 of the Asset Purchase Agreement and notices to American Pan and Premier Pan are to be given to American Pan. Paragraph 15 of the Asset Purchase Agreement requires, among other things, that all notices are to be given in writing.

Murray testifies that the purpose of the Sales Agency Agreement was to protect Lockwood from American Pan, using the equipment that Lockwood had sold to American Pan, manufacturing commercial pans and selling them directly to Lockwood's customers in Canada. (Murray Dep. 69.) The Sales Agency Agreement also protected Lockwood in the event that American Pan decided to put Lockwood in an uncompetitive position through quality, price or delivery of commercial pans to Lockwood for its customers. (Id. 71.) Finally, Murray believes that, if a product is not manufactured by American Pan, the product is not covered by the Sales Agency Agreement. (Murray Dep. 139-40.)

Bundy testifies that the purpose of the Sales Agency Agreement was to hire Lockwood to sell American Pan's products into Canada. (Bundy Dep. 26.) Also, Lockwood was not supposed to sell American Pan's products or any products into the United States. (Id. 66.) This, however, did not apply to the reglaze business. (Id.) Bundy also testifies that Lockwood did not need American Pan's permission to purchase a product from another supplier but Lockwood needed to inform American Pan that it was doing so. (Id. 53.)

### Termination of the Sales Agency Agreement

Following the closing of the Asset Purchase Agreement and the simultaneous execution of the Sales Agency Agreement in August of 1993, there were tens of thousands of transactions between Lockwood and American Pan. (Murray Dep. 75-76; Bundy Dep. 55.) However, signs began to appear that the relationship was deteriorating.

Bundy testifies that American Pan gave Lockwood preferred pricing on American Pan products so Lockwood could resell them. (Bundy Dep. 95.) Murray testifies that there were no

quality issues with these many transactions but there were delivery and price issues. (Murray Dep. 76-78.)

Lockwood complained to American Pan that the pricing that it was receiving from American Pan was too high and not competitive. (Murray Dep. 76-78; Bundy Dep. 55-56; Deposition of Clinton X. Nirschel ("Nirschel Dep.") 38 Sept. 17, 2007; Deposition of Tamara Back ("Back Dep.") 25-27 Sept. 19, 2007.) However, Murray testifies that he never informed American Pan that he intended to place an order with another manufacturer. (Murray Dep. 77.)

In the 1995-96 timeframe, Lockwood obtained new equipment and resumed manufacturing bun pans. (Murray Dep. 58-59.) In the ensuing years, Lockwood expanded the products it manufactured to include other commercial baking pans. (Id. 50-51, 60.) Murray testifies that Lockwood began manufacturing commercial pans again because the prices he was receiving from American Pan were uncompetitive for his customers. (Id. 52, 61.) Murray also testifies that he informed American Pan prior to resuming manufacturing, but not in writing. (Id. 62-64.)

In July of 2003, Lockwood began purchasing stock pans from Cainco as a test to make sure the quality of the Cainco product was equal to American Pan's stock pans. (Murray Dep. 109-10.) Lockwood did this because it needed another source of commercial pans for price comparison. (Murray Dep. 112.) Cainco was the only manufacturer who would sell pans to Lockwood at a lower price than American Pan. (Murray Dep. 106.) American Pan became aware that Lockwood was purchasing from Cainco due to a drawing mistakenly faxed to American Pan by Cainco. (Bundy Dep. 103.)

By the end of 2003, Lockwood had ordered more that $100,000 worth of product from Cainco. (Murray Dep. 117.) Lockwood was satisfied with the quality provided by Cainco and Cainco's prices were "far more competitive" that American Pan's. (Murray Dep. 116-17.) Lockwood did not terminate the Sales Agency Agreement right away because Murray intended to try to get better prices from American Pan and because Cainco had not yet proven themselves as a viable alternative to American Pan. (Murray Dep. 119-21.)

When the Sales Agency Agreement was terminated in September of 2005, Cainco became Lockwood's primary supplier of commercial baking pans. (Murray Dep. 125.) Also, in May of 2005, Lockwood became a 50% shareholder in Cainco. (Murray Dep. 125-27.) The subject of Lockwood investing in Cainco was first raised in October of 2003. (Murray Dep. 127.)

From 2000 until the acquisition of Chicago Metallic by American Pan in 2005, Lockwood competed with Chicago Metallic in Canada on price. (Murray Dep. 162-64.) Lockwood's major competitors in 2005 for stock pans were Chicago Metallic, Crown Custom Metal, Advance Tabco and Westar Products. (Murray Dep. 55-57.)

On June 16, 2005, Lockwood terminated the Sales Agency Agreement effective September 16, 2005. (Murray Dep. 81; Bundy Dep. 68.) Lockwood, according to Murray, terminated the Sales Agency Agreement because the prices that American Pan was offering to Lockwood did not permit Lockwood to remain competitive in the commercial baking pan business. (Murray Dep. 81-82.) Lockwood was losing business to Nat Muraca, Chicago Metallic's agent in Canada. (Murray Dep. 84-86.) American Pan has considered Lockwood to be a competitor since Lockwood terminated the Sales Agency Agreement. (Bundy Dep. 29.)

Following termination of the Sales Agency Agreement, American Pan filed its complaint that is now before the Court. Lockwood then filed its counterclaims. The standard of review will next be set forth.

## STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the

nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th

-10-

Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

Further, in a matter in which a federal court is exercising diversity jurisdiction, such as the matter now before the Court, the federal court must apply the choice-of-law rules of the forum state. *International Insurance Co. v. Stonewall Insurance Co.*, 86 F.3d 601, 604 (6th Cir. 1996). In a previous Entry and Order, this Court has determined that the choice-of-law rules of Ohio, the forum state, provide that this dispute involving the Sales Agency Agreement is to be governed by the laws of Ontario and the laws of Canada as applicable. (Doc. #10.)

## LOCKWOOD'S MOTION FOR SUMMARY JUDGMENT

In its Motion for Summary Judgment, Lockwood indicates that American Pan claims that Lockwood breached the Sales Agency Agreement in two ways: by purchasing commercial baking pans from Cainco instead of purchasing those pans from American Pan and by selling commercial pans to six companies based in the United States. However, American Pan's FAC makes no mention of a breach by selling commercial pans into the United States. Also, in its Response to Lockwood's Motion for Summary Judgment, American Pan only argues that Lockwood breached the Sales Agency Agreement by purchasing commercial baking pans from Cainco. American Pan presents no evidence or argument that Lockwood breached the Sales Agency Agreement by selling products into the United States and does not otherwise respond to Lockwood's assertion that American Pan is claiming a breach of contract for selling products

into the United States. Therefore, Lockwood's alleged selling of commercial pans to six companies based in the United States will not be considered to be a breach-of-contract claim made by American Pan.

Under Ontario law, the elements of a breach-of-contract claim are: the particulars of the nature of the contract including the terms; the parties to the contract including privity of contract between the plaintiff and defendant; which term or terms was breached; and the damages alleged to have flowed from the breach. *McCarthy Corp. PLC v. KPMG LLP*, No. 05-CL-5816, [2007] O. J. No. 32, ¶ 26 (O.S.C.J. Jan. 8, 2007), *available at* 2007 ON.C. LEXIS 26; *McCarthy Corp. PLC v. KPMG LLP*, No. 05-CL-5816, [2006] O. J. No. 1492, ¶ 42 (O.S.C.J. Apr. 18, 2006), *available at* 2006 ON.C. LEXIS 1447. Also, the plaintiff, American Pan in this instance, has the burden of proving a breach of contract. *Id.*

When interpreting a contract, the court is to give effect to the intentions of the parties at the time they entered into the contract. *Algonquin Power (Long Sault) Partnership v. Chubb Insurance Co. of Canada*, No. 98-CV-158796CM, [2003] 50 C.C.L.I. (3d) 107, ¶ 128 (O.S.C.J. May 23, 2003), *available at* 2003 CarswellOnt 1941. Contract provisions are interpreted in the context of the contract as a whole. *Id.* If there is no ambiguity, the court is to give effect to the contract provision. *Id.* If there is ambiguity, the contract is interpreted in a manner that favors common sense and is in accordance with commercial reality. *Id.* at ¶ 129.

In this case, the parties do not dispute that it is the Sales Agency Agreement that is at issue and that they were parties to the Sales Agency Agreement. The first two elements of a breach-of-contract claim are, therefore, satisfied.

Regarding the third element, American Pan alleges that Lockwood breached specific language of the Sales Agency Agreement under the heading "Supplier Relationship." That language provides that, "[i]f the Manufacture[r]s are unable to maintain any one of the price, quality and/or delivery requirements, then the Seller may seek other sources for the respective product(s) after the seller, prior to placing the order, informs the Manufacturers."

It is undisputed that the prices offered to Lockwood by Cainco were lower than the prices offered to Lockwood by American Pan. It is also undisputed that Lockwood informed American Pan that American Pan's prices were uncompetitive. Finally, it is undisputed that Lockwood did not need to seek American Pan's approval to purchase pans from another supplier. (Bundy Dep. 56.) Whether or not the Sales Agency Agreement was breached, then, turns upon whether the Sales Agency Agreement requires Lockwood to inform American Pan specifically that it was ordering commercial baking pans from Cainco before Lockwood ordered the commercial baking pans from Cainco.

The stated purpose of the Sales Agency Agreement is to give Lockwood the exclusive right to sell American Pan products in Canada and prevent American Pan from competing with Lockwood for the sale of American Pan products in Canada. In addition, Lockwood agreed not to compete with American Pan for the sale of American Pan's products in the United States. Finally, either party could terminate the Sales Agency Agreement at any time without any limitation as to reason for termination and upon giving ninety (90) days written notice.

The Sales Agency Agreement does not indicate that American Pan has a right to match other commercial baking pan prices that Lockwood might obtain. Further, the Sales Agency Agreement does not prevent Lockwood from buying commercial baking pans from other

sources, even if Lockwood were required to inform American Pan that it intended to do so. Also, the Sales Agency Agreement does not limit Lockwood to selling only American Pan products. Finally, Lockwood only had an obligation under the Sales Agency Agreement to purchase commercial baking pans from American Pan so long as American Pan's prices for the commercial baking pans were competitive.

The intent of the Sales Agency Agreement was that Lockwood would be the only seller of American Pan products in Canada and that Lockwood would not compete against American Pan for the sale of American Pan products into the United States. This purpose is not offended by the purchase and resale of Cainco commercial baking pans by Lockwood into Canada.

A requirement that Lockwood specifically inform American Pan before Lockwood ordered commercial baking pans from another supplier would have no effect with regard to the Sales Agency Agreement. The Sales Agency Agreement does not give American Pan any right to match prices or prevent Lockwood from obtaining commercial baking pans from another supplier if American Pan is unable to be price competitive. Also, American Pan was aware that its prices to Lockwood may not have been competitive and had the right to terminate the Sales Agency Agreement and sell its products into Canada in competition with Lockwood if it elected to do so. Pursuant to the Sales Agency Agreement, informing American Pan that its prices are uncompetitive is enough and Lockwood did so. Therefore, Lockwood has not breached the Sales Agency Agreement's requirement that Lockwood inform American Pan.

American Pan is also required to present evidence that it was damaged by Lockwood's alleged breach of the Sales Agency Agreement. However, even if the requirement to inform could be read as a requirement to inform that Lockwood specifically intended to place an order

-14-

from another supplier, American Pan has identified no evidence or presented any argument that it would be damaged thereby. Particularly, American Pan has presented no evidence that it could have met Cainco's prices and retained a profit.

American Pan has not satisfied the last two elements of a breach-of-contract claim under the laws of Ontario. There are no genuine issues of material fact and Lockwood is entitled to judgment as a matter of law on America Pan's claim that Lockwood breached the Sales Agency Agreement. America Pan's Complaint is DISMISSED.

## AMERICAN PAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

American Pan seeks summary judgment on Counts Two, Three, Four and Five of Lockwood's Amended Counterclaim. Lockwood responds that American Pan's Motion should be denied. Counts Two, Three, Four and Five of America Pan's Amended Counterclaim will be addressed seriatim.

### Count Two: Conspiracy To Fix Prices In Violation of U.S. and Ohio Antitrust Law

Count Two of Lockwood's Amended Counterclaim is for conspiracy to fix prices in violation of the Sherman Antitrust Act, 15 U.S.C. § 1 et. seq. and in violation of Ohio's Valentine Act, Ohio Rev. Code § 1331.01 et seq. American Pan seeks summary judgment on this claim arguing that there was no antitrust conspiracy, Lockwood has not suffered an antitrust injury and Lockwood cannot show harm to competition. Lockwood responds that this claim rests on evidence of a horizontal price fixing agreement between American Pan and Chicago Metallic, American Pan's largest and only significant competitor. These types of agreements, according to Lockwood are per se illegal.

## The Sherman Antitrust Act

Section 1 of the Sherman Antitrust Act prohibits "every contract, combination…, or conspiracy, in restraint of trade or commerce. 15 U.S.C. § 1. "Recognizing that nearly every contract binding parties to an agreed course of conduct amounts to some sort of 'restraint of trade,' the Supreme Court has limited the restrictions of section 1 to bar only 'unreasonable restraints.'" *Care Heating & Cooling, Inc. v. American Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005)(quoting *National Hockey League Players' Association v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003), *aff'd*, 419 F.3d 462 (6th Cir. 2005)). For example, price fixing, in its literal sense, is not condemned per se because every sale is an agreement on price. *Expert Masonry, Inc. v. Boone County, Kentucky*, 440 F.3d 336, 344 (6th Cir. 2006)(citing *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001)).

To establish a claim under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, the plaintiff must prove that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy. *Id.* at 342 (citing *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988)). When assessing an antitrust claim, courts must first determine whether the alleged restraints are per se illegal. *Id.*

Restraints that are per se illegal are restraints that "have such a clear lack of an redeeming virtue that any restraint of that type is conclusively presumed to be unreasonable." *Id.* (citing *Bailey's, Inc. v. Windsor America, Inc.*, 948 F.2d 1018, 1027 (6th Cir. 1991)). Restraints

-16-

that are not per se illegal are analyzed under the "rule of reason" approach. *Id.* at 342. The "rule of reason" approach is a case by case analysis of the effect of restraints on competition. *Id.* Under the "rule of reason" analysis, a court analyzes whether the challenged agreement is one that promotes competition or one that suppresses competition. *Id.* This analysis is resolved by distinguishing between conduct that injures **competition** and conduct which may injure **competitors**. *Id.*

There is an automatic presumption in favor of applying the "rule of reason" standard except where courts have carved out certain categories of restraints as per se illegal. *Id.* at 343. There are also restraints that courts have determined to be presumptively reasonable. *Id.* at 344. When a restraint is per se illegal, the plaintiff need only prove that (1) two or more entities engaged in a conspiracy, combination or contract (2) to effect a restraint or combination prohibited per se (3) that was the proximate cause of plaintiff's antitrust injury. *Id.* at 342.

### (1) Antitrust Conspiracy

An antitrust conspiracy may be shown by direct or circumstantial evidence. *Re/Max International, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999), *cert. denied*, 535 U.S. 987 (2002). When used, circumstantial evidence must tend to exclude the possibility of independent conduct. *Id.* Factors to evaluate when evaluating circumstantial evidence of a conspiracy include: (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common

motive to conspire. *Id.* Generally, an affirmative answer to the first factor will consistently tend to exclude the likelihood of independent action. *Id.*

There is a distinction between concerted and independent action. The plaintiff must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. *Matsushita*, 475 U.S. at 588. In other words, the plaintiff must show that the inference of conspiracy is reasonable in light of the competing inferences of independent or collusive action that could not have harmed the plaintiffs. *Id.*

While a showing of "conscious parallelism" is admissible evidence from which the fact finder may infer agreement, "conscious parallelism" alone does not violate antitrust law. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1064 (2007). "Conscious parallelism" is parallel business behavior. *Id.* "Conscious parallelism" may be a reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions. *Id.* When allegations of parallel conduct are set out to support an antitrust claim, they must be placed in a context that raises a suggestion of a preceding agreement. *Id.*

### (2) Per Se Restraint

To determine if restraints are per se illegal, courts look to the circumstances, details, and logic of a restraint to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction may be reached. *Expert Masonry*, 440 F.3d at 343. If a restraint is per se illegal, further examination of the practice's impact on the market is unnecessary for finding that it produced adverse, anticompetitive effects within relevant product and geographic markets. *Id.* at 342. Per se

liability is reserved for only those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

In their initial determination regarding the type of constraint, courts distinguish between horizontal restraints that involve direct competitors at a given level of the market and vertical restraints that typically involve entities that are upstream or downstream of one another. *Id.* Certain horizontal agreements are seen as especially injurious and have been found to be per se illegal. On the other hand, vertical restraints present a less apparent threat to competition and are generally analyzed under the "rule of reason" approach. *Id.* For example, price-fixing agreements between two or more competitors, known as horizontal price-fixing agreements, have been determined by the Supreme Court to be per se illegal. *Texaco,* 547 U.S. at 5.

While price-fixing arrangements may be illegal per se, the exchange of price information among competitors does not invariably have anticompetitive effects. *Continental Cablevision of Ohio, Inc. v. American Electric Power Co.*, 715 F.2d 1115, 1118 (6th Cir. 1983)(citing *United States v. United States Gypsum Co.*, 438 U.S. 422, n.16 (1978)). Such practices can, in certain circumstances, increase economic efficiency. *Id.* Therefore, the exchange of price information, without more, is not a per se violation of the antitrust laws. *Id.* To make a per se violation of antitrust laws, there must be a purpose or effect of restraining competition or some other evidence of an actual agreement to restrain competition in addition to the exchange of price lists. *Id.*

**(3) Antitrust Injury**

In any event, the plaintiff must prove an antitrust injury. *Matsushita*, 475 U.S. at 585-86; *Expert Masonry*, 440 F.3d at 345; *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, n.15 (6th Cir. 2003), *cert. denied*, 543 U.S. 939 (2004). An antitrust injury is an injury of the type that the antitrust laws were intended to prevent and that flows from that which makes a defendant's acts unlawful. *Expert Masonry*, 440 F.3d at 346. (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 497 (1977)). "The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce - in a word to preserve the right of freedom to trade." *Id.* (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). Therefore, courts must find a cognizable antitrust injury to avoid the real possibility that the antitrust action could itself have anticompetitive consequences. *Id.*

The requirement that an antitrust injury must be shown ensures that the plaintiff can recover only if the loss stems from a competition-reducing aspect of the defendant's behavior. *In re Cardizem*, 332 F.3d at 910. Regarding whether the alleged antitrust injury was the proximate cause of plaintiff's injury, the plaintiff must show either that the antitrust violation was a necessary predicate to their injury or that the defendant could injure the plaintiff only by engaging in the antitrust violation. *Id.* at 912.

Two types of damages may be shown after an antitrust violation and proximate cause are proved. *Auwood v. Harry Brandt Booking Office, Inc.*, 647 F. Supp. 1551, 1552 (D. Conn. 1986). First is the demand theory which requires the plaintiff to provide that its bid was rejected because of the unlawful conspiracy. *Id.* Under this theory, the plaintiff is entitled to the

difference between the profits it would have made if its bid was not rejected minus the profits it actually made. *Id.* The second type of damages result from a comparability analysis. *Id.* To receive damages under a comparability analysis, the plaintiff must show that it was futile to bid on the product because of the alleged conspiracy and that its product was comparable. *Id.*

### The Foreign Trade Antitrust Improvements Act

American Pan argues that, under the Foreign Trade Antitrust Improvements Act (the "FTAIA"), the Sherman Antitrust Act is inapplicable to the conduct of which Lockwood complaints. The FTAIA makes clear to American exporters and to firms doing business outside the United States, that the Sherman Antitrust Act does not prevent them from entering into business arrangements, however anticompetitive, so long as those arrangements adversely affect only foreign markets. *F.Hoffmann-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004). Thus, the FTAIA makes the Sherman Antitrust Act inapplicable to conduct involving non-import foreign trade or commerce. *Empagran S.A. v. F.Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1268 (D.C. Cir. 2005). The exception is when the conduct has a direct, substantial and reasonably foreseeable effect on domestic trade or commerce and such effect gives rise to a claim under the Sherman Antitrust Act. In other words, the FTAIA excludes anticompetitive conduct that causes only foreign injury from the reach of the Sherman Antitrust Act. *Id.* at 1269.

In this case, Lockwood alleges that American Pan entered into a horizontal price fixing agreement with Chicago Metallic that is per se illegal under antitrust law. No evidence or argument is provided regarding a "rule of reason" analysis. Therefore, Lockwood's claim will be analyzed to determine if there is evidence of an actionable per se illegal antitrust conspiracy.

**Existence Of an Antitrust Conspiracy**

Lockwood must first show the existence of an antitrust conspiracy. An antitrust conspiracy may be shown by direct or circumstantial evidence. When used, circumstantial evidence must tend to exclude the possibility of independent conduct.

There is evidence that Chicago Metallic was American Pan's most significant competitor during the 2000-2005 time frame. (Deposition of Richard Barton ("Barton Dep.") 25-26 May 17, 2007.) There is also evidence that Chicago Metallic and American Pan were the only full-line baking pan manufacturers in the United States at the time. (Id. 36.) Finally, there is undisputed evidence that American Pan and Chicago Metallic exchanged price lists from 2000 to 2005. (Id. 16.) Even though they were competitors, American Pan and Chicago Metallic would sell commercial pans to each other and the price lists were used, according to Richard Barton[2] ("Barton"), to know what was to be paid for the pans. (Id. 17.)

Julie Schmidt ("Schmidt"), a current CM Packaging[3] employee, who reported directly to Barton and Jennifer Bryan ("Bryan") during the relevant time period, testified that she had an understanding that she was not to vary from Chicago Metallic's price list when selling commercial baking pans because of an understanding with American Pan that they would not vary off of their price list. (Deposition of Julie Schmidt ("Schmidt Dep.") 7-8, 15-16 Sept. 17, 2007.) When asked if she was told by Barton that American Pan would be quoting by their price list, Schmidt responded, "I believe that it was more assumed that they were quoting by the book. I mean I don't know that he knew for sure." (Id. 17.) She also understood that she was not to

_____

[2]Richard Barton was a Chicago Metallic Vice President during the relevant time period.

[3]CM Packaging is the part of Chicago Metallic that was not sold to American Pan in 2005.

vary from Chicago Metallic's price list because "there could be price wars," because it was "illegal" to sell the same pan to different customers for different prices and because Chicago wanted all of its customers to "get the same price." (Id. 14-16.) Later in her deposition, Schmidt was asked, "Just so the record is clear, from your conversations with Mr. Barton, is it your understanding and testimony that Chicago Metallic through Mr. Barton, had an understanding with American Pan that both companies would quote from their custom pan lists; is that correct?" (Id. 29-30.) Schmidt responded, "Yes, I believe so." (Id.)

Jennifer Bryan, who worked at Chicago Metallic during the relevant period of 2000-2005 and reported directly to Barton testified that she believed that American Pan was "playing by the book and working off of the price list that had been exchanged between both companies." (Deposition of Jennifer Bryan ("Bryan Dep.") 29 July 19, 2007.) She also testified that, when Chicago Metallic found out that Chicago Metallic had priced from its price list and American Pan had "discounted from the agreed pricing," Barton would be upset and make a phone call to find out why American Pan was not "playing by the book." (Id.)

Barton testifies that, although American Pan and Chicago Metallic exchanged price lists, they never discussed "keeping the price list close to each other in price" or "fixing" their prices. (Id. 17-18.) He also denies ever discussing why American Pan was giving discounts with anyone at American Pan. (Id. 18.) Finally, as part of the negotiations regarding the sale of Chicago Metallic to American Pan in 2005, Barton had a Chicago Metallic catalogue sent to Gilbert Bundy's home. (Id. 19-20.)

In this case, Lockwood has presented evidence that Chicago Metallic and American Pan exchanged price lists and evidence that Chicago Metallic and American Pan may have agreed

not to vary from their own respective price lists. However, this is not evidence that Chicago

Metallic and American Pan conspired to determine what the prices on each of their respective

price lists would be. Lockwood has presented no evidence that tends to exclude the possibility

that Chicago Metallic and American Pan acted independently when they established their

respective price lists. Further, Lockwood has not shown that Chicago Metallic's and American

Pan's actions in setting their respective prices, if taken independently, would be contrary to

either of their economic self-interests nor has Lockwood presented any evidence indicating that

Chicago Metallic and American Pan had a common motive to conspire to fix prices. At best, the

evidence presented by Lockwood is indicative of parallel business behavior, which, without

more, does not show a conspiracy to fix prices. Therefore, Lockwood has not presented evidence

that there is a genuine issue of material fact with regard to the first element of a per se antitrust

violation.

### Alleged Restraint

To satisfy the second element of a per se antitrust violation, Lockwood must present

evidence that Chicago and American Pan conspired to effect a restraint or combination that is

prohibited per se. In response to this requirement, Lockwood argues that horizontal price-fixing

agreements are per se illegal and Chicago Metallic and American Pan conspired in a horizontal

price-fixing agreement.

As determined above, Lockwood has identified evidence that Chicago Metallic and

American Pan shared price lists and may have agreed to follow their respective price lists.

Lockwood has not, however, presented evidence that Chicago Metallic and American Pan

conspired to fix prices. While price-fixing arrangements are per se illegal, the sharing of price

lists, without more, is not. Therefore, Lockwood has not presented evidence to satisfy the second element of a per se antitrust violation.

### Alleged Proximate Cause and Antitrust Injury

The final requirement to make a per se antitrust violation is to present evidence of an antitrust injury. In response Lockwood first argues that, since it has alleged a per se violation, damages automatically flow. However, this is not the case. To satisfy the requirement of a per se antitrust violation, the plaintiff must present evidence of antitrust damages.

Lockwood also argues that the conspiracy between Chicago Metallic and American Pan eliminated the opportunity for purchasers, including Lockwood, to negotiate a better price for custom baking pans thereby causing direct injury. In support, Lockwood identifies Murray's testimony that Lockwood has suffered damages because of noncompetitive prices from American Pan. Murray alleges that Lockwood was losing orders because American Pan's prices were not competitive. (Murray Dep. 84-85.) He also testified that Chicago Metallic was picking up the business that Lockwood lost. (Murray Dep. 164.) Murray also testified that Chicago Metallic was offering products cheaper than Lockwood could sell. (Murray Dep. 86.)

Lockwood also argues that it can recover from American Pan the alleged damages that it suffered from purchases from Chicago Metallic. Finally, Lockwood argues that, even if it was unable to prove the amount of its damages, it would still be entitled to nominal damages and attorneys' fees.

The injuries alleged by Lockwood are not the type of injuries that antitrust law is intended to prevent. The injuries alleged by Lockwood are the result of lower prices and enhanced competition in the commercial baking pan market. Also, with regard to probable cause,

Lockwood has not shown that the alleged antitrust violation was a necessary predicate to its alleged injury or that American Pan could injure Lockwood only by engaging in the antitrust violation. The behavior of which Lockwood complains resulted, by Murray's own admission, in lower prices and enhanced competition in the commercial baking pan market. Therefore, Lockwood has not presented evidence that satisfies the third element of a per se antitrust violation.

Finally, American Pan argues that, under the FTAIA, the Sherman Antitrust Act is inapplicable to Lockwood's claim. The FTAIA excludes anticompetitive conduct that causes only foreign injury from the reach of the Sherman Antitrust Act. However, Lockwood responds that it has alleged a price fixing agreement between the only two full-line custom baking pan manufacturers in the United States as to prices of custom baking pans sold in the United States. If Lockwood could show such an agreement, it would not be excluded by the FTAIA. However, Lockwood has not shown such an agreement. In sum, Lockwood has not presented evidence that satisfies any of the three elements of an actionable per se Sherman antitrust violation.

Lockwood also claims an antitrust violation under Ohio's antitrust statute. Ohio's antitrust statute, the Valentine Act, was patterned after the Sherman Antitrust Act, and, therefore, Ohio courts interpret the Valentine Act in light of federal judicial construction of the federal Sherman Antitrust Act. *C.K. & J.K., Inc. v. Fairview Shopping Center Corp.*, 407 N.E.2d 507, 509 (Ohio 1980). Since Lockwood has not satisfied any of the elements of its federal antitrust claim and Lockwood's state claim is interpreted the same as its federal claim, Lockwood's claim that American Pan violated Ohio's Valentine Act must also fail.

There are no genuine issues of material fact and American Pan is entitled to judgment as a matter of law on Count Two of Lockwood's Amended Counterclaim for violation of antitrust law. Count Two of Lockwood's Amended Counterclaim is DISMISSED.

### Count Three: Conspiracy To Injure

Count Three of Lockwood's Amended Counterclaim is a common law conspiracy-to-injure claim. In Ohio, a civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages. *Williams v. Aetna Finance Co.*, 700 N.E.2d 859, 868 (Ohio 1998)(quoting *Kenty v. Transamerica Premuim Insurance Co.*, 650 N.E.2d 863, 866 (Ohio 1995)). "To establish a claim of civil conspiracy, the following elements must be proven: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Nilavar v. Mercy Health System-Western Ohio*, 494 F. Supp.2d 604, 627 (S.D. Ohio 2005). Therefore, "[a]n underlying unlawful act is required before a civil conspiracy claim can succeed." *Williams*, 700 N.E.2d at 868.

American Pan argues that Lockwood cannot establish an unlawful act upon which its civil conspiracy claim is based because American Pan is entitled to summary judgment on Lockwood's antitrust conspiracy claim. Lockwood responds that American Pan is not entitled to summary judgment on Lockwood's civil conspiracy claim because American Pan is not entitled to summary judgment on Lockwood's antitrust conspiracy claim. Neither party disputes that Ohio law is to be applied to Count Three of Lockwood's Amended Counterclaim.

Lockwood's response indicates that Lockwood's civil conspiracy claim is based upon the alleged horizontal price-fixing conspiracy. However, Count Two of Lockwood's Amended

-27-

Counterclaim for antitrust violations has been dismissed. Therefore, Lockwood has presented no evidence of an underlying unlawful act. There are no genuine issues of material fact and American Pan is entitled to judgment as a matter of law on Count Three of Lockwood's Amended Counterclaim. Count Three of Lockwood's Amended Counterclaim for civil conspiracy is DISMISSED.

### Count Four: Violation Of the Canadian Competition Act

Count Four of Lockwood's Amended Counterclaim is for violation of the Canadian Competition Act, R.S. 1985, c. C-34, s. 1 et seq. The elements of proof relating to this claim under the Competition Act are:

> (a) the parties and their relationship with each other;

> (b) an agreement between the parties to conspire;

> (c) the precise purpose or objects of the alleged conspiracy;

> (d) the overt acts which are alleged to have been done by each of the conspirators in pursuance and in furtherance of the conspiracy; and

> (e) the injury and particulars of the special damage suffered by the plaintiff by reason of the conspiracy.

*OZ Merchandising Inc. v. Canadian Professional Soccer League* Inc., No. 04-CV-026293, [2006] O. J. No. 2882 ¶ 15 (O.S.C.J. July 13, 2006), *available at* 2006 CarswellOnt 4362, *aff'd*, 2007 CarswellOnt 4991 (O.D.C. Jun. 14, 2007).

Lockwood's argument that there are genuine issues of material fact regarding their claim that the Competition Act was violated rests upon the alleged conspiracy between Chicago Metallic and American Pan to fix prices. However, as set forth above, Lockwood has not presented evidence that satisfies any of the three elements of an actionable antitrust conspiracy

claim. They, therefore, have not presented evidence that satisfies all of the elements of a Competition Act claim, particularly the elements requiring an agreement to conspire and antitrust damages.

There are no genuine issues of material fact and American Pan is entitled to judgment as a matter of law on Count Four of Lockwood's Amended Counterclaim. Count Four of Lockwood's Amended Counterclaim for violation of the Competition Act is, therefore, DISMISSED.

<u>**Count Five: Breach Of the Duty Of Good Faith**</u>

Count Five of Lockwood's Amended Counterclaim is for breach of the duty of good faith. American Pan initially argues that Lockwood cannot satisfy its breach-of-the-duty-of-good-faith claim under Ohio law. Lockwood responds that this claim is premised on the law of Ontario and not on Ohio law. American Pan replies that Lockwood is correct that the law of Ontario applies but the result under Ontario law is the same.

Lockwood argues that the law of Ontario provides for a breach-of-the-duty-of-good-faith claim that is separate from a contract claim. American Pan argues that it does not.

In the most recent decision cited by either of the parties, the Ontario Court of Appeal found that, while Canadian courts have proceeded cautiously in recognizing duties of good faith in the performance and enforcement of contracts, "Canadian courts have not recognized a stand-alone duty of good faith that is independent from the terms expressed in a contract or from the objectives that emerge from those provisions. The implication of a duty of good faith has not gone so far as to create new, unbargained-for, rights and obligations." *Transamerica Life Canada Inc v. ING Canada Inc.*, 68 O.R.3d 457 ¶¶ 51, 53 (O. Ct. App. 2003), *available at* 2003

CarswellOnt 4834. Canadian courts, however, have implied a duty of good faith to secure the performance and enforcement of the contract made by the parties. Id. ¶ 53.

In the earlier cases cited by Lockwood, Canadian courts have permitted breach-of-good-faith and breach-of-trust claims to survive motions to dismiss (termed motions to strike in Canada). *53088 Ontario Ltd. v. Sobeys Inc.*, No. 00-CL-3796, 2001 WL 444362 ¶ 6 (O.S.C.J. Jan. 30, 2001); *LeMesurier v. Andrus*, 54 O.R.2d 1 ¶¶ 22, 23 (O. Ct. App. 1986); *Greenberg v. Meffert*, 50 O.R.2d 755 ¶ 26 (O. Ct. App. 1985). In doing so, the courts recognized that Canadian law is not clear as to whether a duty of good faith in the performance of a contract is independent of the contract language. However, none of the cases cited by Lockwood specifically recognize a duty of good faith that is separate from and independent of the contract.

Therefore, Ontario law does not currently recognize a breach-of-the-duty-of-good-faith claim that is separate and independent from a breach of contract claim. American Pan is entitled to judgment as a matter of law on Count Five of Lockwood's Amended Counterclaim. Count Five of Lockwood's Amended Counterclaim for breach of the duty of good faith is DISMISSED.

## SUMMARY

Lockwood's Motion for Summary Judgment is GRANTED. American Pan has not satisfied all of the elements of a breach-of-contract claim brought under the laws of Ontario. America Pan's Complaint is DISMISSED.

American Pan's Motion for Summary Judgment is also GRANTED. Lockwood has not presented evidence that satisfies any of the three elements of an actionable per se Sherman antitrust violation. There are no genuine issues of material fact and American Pan is entitled to

judgment as a matter of law on Count Two of Lockwood's Amended Counterclaim for violation of antitrust law. Count Two of Lockwood's Amended Counterclaim is DISMISSED.

Also, Lockwood has presented no evidence of an underlying unlawful act. Therefore, there are no genuine issues of material fact and American Pan is entitled to judgment as a matter of law on Count Three of Lockwood's Amended Counterclaim. Count Three of Lockwood's Amended Counterclaim for civil conspiracy is DISMISSED.

Also, Lockwood has not presented evidence that satisfies all of the elements of a Competition Act claim. There are no genuine issues of material fact and American Pan is entitled to judgment as a matter of law on Count Four of Lockwood's Amended Counterclaim. Count Four of Lockwood's Amended Counterclaim for violation of the Competition Act is, therefore, DISMISSED.

Finally, Ontario law does not currently recognize a breach-of-the-duty-of-good-faith claim that is separate and independent from a breach of contract claim. American Pan is, therefore, entitled to judgment as a matter of law on Count Five of Lockwood's Amended Counterclaim. Count Five of Lockwood's Amended Counterclaim for breach of the duty of good faith is DISMISSED.

Count One of Lockwood's Amended Counterclaim for breach of the Sales Agency Agreement remains to be adjudicated. American Pan allegedly breached the Sales Agency Agreement by competing with Lockwood in Canada and marketing, selling and offering for sale its products in Canada.

**DONE** and **ORDERED** in Dayton, Ohio, this Fifteenth day of February, 2008.

**s/Thomas M. Rose**
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record